**Jerome D. LOHMANN, By and Through his legal guardian, Tammy LOHMANN, Respondent,**

v.

**NORFOLK & WESTERN RAILWAY COMPANY, Appellant.**

No. WD 52089.

Missouri Court of Appeals, Western District.

Submitted Oct. 17, 1996.

Decided April 15, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 27, 1997.

Application to Transfer Denied Aug. 19, 1997.

Richard E. McLeod, Kansas City, for appellant.

James P. Frickleton, Kansas City, for respondent.

Before SMART, P.J., and SPINDEN and ELLIS, JJ.

SMART, Presiding Judge.

This appeal arises from a negligence suit brought by Jerome and Tammy Lohmann, plaintiffs, against Norfolk & Western Railway Company, defendant, for injuries sustained by Mr. Lohmann when the tractor-trailer unit he was driving was struck by defendant's train at a railroad crossing on Highway 24 in Monroe City, Missouri. Following a trial, plaintiffs obtained judgments for injuries and loss of consortium amounting collectively to $9,639,000.00. Norfolk & Western Railway Company appeals from the trial court's judgment in favor of plaintiffs. On appeal, the railroad raises ten contentions of error, including claims that the court erred in failing to make rulings which would have excluded a claim preempted by state and federal statutory law. The railroad also raises contentions related to the instructions, to the denial of a continuance and the admission and exclusion of certain evidence.

Judgment is affirmed.

## FACTUAL BACKGROUND

The collision between the truck and the freight train occurred on December 22, 1990, on the south end of Monroe City, Missouri, at the intersection of Highway 24 and defendant's railroad tracks. Mr. Lohmann was driving a truck for United Parcel Service from Columbia, Missouri, to Burlington, Iowa. Highway 24 is a major highway, carrying significant amounts of traffic. The railroad crossing at Highway 24 handled a daily traffic volume of approximately 4,000 vehicles and up to 12 trains a day.

Robert Werneth, who also drove for UPS, followed several miles behind Lohmann on the trip from Columbia to Burlington in his double tractor-trailer. Lohmann and Werneth left Columbia at approximately 4:00 a.m. and headed north on Highway 63 to Moberly, and then northeast on Highway 24 to Monroe City.

Just before 6:00 a.m., Plaintiff Lohmann approached the train crossing in Monroe City in the darkness. Plaintiff was northbound. There is a factory operated by Pace Industries on the north side of the tracks, east of the crossing. Lohmann and Werneth were familiar with the train crossing, having traveled the route regularly. As Plaintiff Lohmann approached the crossing, a Norfolk train destined for Moberly was also approaching the crossing from the east at the same moment. The train was traveling in excess of 40 miles per hour. At a distance of approximately one-quarter mile from the crossing, the train's brakeman noticed plaintiff's truck moving toward the crossing. Observing plaintiff's truck decelerate, the brakeman anticipated the truck would stop.

There was a dispute about the extent of use of the train whistle. The train rules required that the whistle be engaged at about 1400 feet from the crossing (where there is a whistle post) and that the whistle be continued (two long blasts, one short blast, and two long blasts) through the crossing. The evidence indicated that there was only one or two short whistles just prior to the collision. The crossing is equipped with bells, and there are four flashing red lights facing each direction. At trial, the parties disputed whether the warning lights were working.[1] There was no evidence presented as to whether the bells were functioning. In any event, Plaintiff Lohmann did not come to a complete stop, but, after slowing to several miles an hour, began to proceed across the tracks. Before his tractor-trailer cleared the tracks, the train collided violently with his unit, pushing the front part of the unit westbound, and pushing it over, causing permanent and disabling injuries to Plaintiff Lohmann.

Mr. Lohmann's collision with the train was the third collision at that crossing in 1990. All of the collisions occurred in the darkness. Prior to 1990, there had been only one collision in the history of that crossing, which had existed at least 28 years. There was evidence that the electrical equipment related to the flashing lights was quite old, and possibly in need of replacement. There was also evidence that, on several occasions in 1989 and 1990, the warning lights did not come on as a train was approaching.

In October, 1993, the Lohmanns filed suit against the railroad for Mr. Lohmann's injuries. Plaintiffs alleged that the railroad was negligent in failing to warn, failing to keep a lookout, failing to slow down the train, failing to have proper warning equipment at the crossing, and failing to adequately maintain the equipment. Plaintiffs alleged that the crossing was unusually hazardous, and that because of the extra danger the railroad was required to exercise special care to avoid a collision. After a trial, the jury returned a verdict in favor of plaintiffs, assessing Mr. Lohmann's damages at $8.5 million, and Mrs. Lohmann's claim for loss of consortium at $3.4 million. The jury allocated 81% of the fault to the railroad, and 19% to Mr. Lohmann. Thus, the judgments for plaintiffs were calculated at $6.885 million for Mr. Lohmann and $2.754 million for Mrs. Lohmann. The railroad appeals the judgment.

### Preemption

The railroad raises two claims of error related to the issue of liability for the failure to install electronic gates at the railroad crossing. First, defendant claims that the trial court erred in failing to grant its motion for directed verdict or motion for judgment notwithstanding the verdict on Lohmann's claim of inadequate crossing protection and in submitting the claim to the jury because the issue of the duty to install electronic gates has been preempted by state and federal law. Second, defendant argues that the trial court erred in allowing the admission of evidence regarding the lack of electronic gates. The railroad also has three other claims of error which are indirectly related to the effect of the trial court rulings on the issue of gates. Points I through V will be considered together.

---

1. Plaintiff Lohmann suffered serious brain injuries as well as other very severe injuries, and was unable to offer testimony at trial. The dispute about whether the lights were functioning was based in part in the conflicting opinions of expert witnesses. Plaintiff's expert examined the equipment which was destroyed in the course of the collision, and determined from a remaining light bulb that it was not in a flashing mode at the time the lighting equipment was destroyed. Also, one witness, who was behind Lohmann as Lohmann approached the crossing, remembered looking toward the crossing, but did not remember seeing the warning lights flashing. She was already aware that a train was approaching, and thus was not particularly looking for the warning lights. However, she believes that if the lights had been on she would have noticed them. The brakeman testified that as he looked toward the crossing from some 1500 feet out, he could see the flashing lights come on. He did not testify that he observed the lights after that point. The evidence showed that the circuit was designed so that the lights would come on at about 2200 feet. There were also some individuals who presented evidence that, on various occasions in 1989 and 1990, the warning lights did not activate when they should have, or did not activate at all when a train was passing through the crossing.

Defendant–Appellant's claim that the common law negligence claims are preempted by federal law is based on the 1970 enactment by Congress of the Federal Railroad Safety Act, 45 U.S.C. § 434, and on the regulations adopted thereunder.[2] *See Walker v. St. Louis–Southwestern Railway Co.,* 835 S.W.2d 469 (Mo.App.1992); *CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). Appellant's contention that the common law claims are preempted by state regulation is based on § 389.610.4 RSMo 1994. *See Coon v. Atchison, Topeka and Santa Fe,* 826 S.W.2d 66 (Mo.App.1992) (dealing with predecessor provisions). *See also Moore v. Atchison, Topeka and Santa Fe Railway,* 966 F.2d 351, 352 (8th Cir.1992). Preemption has been applied to such causes of action as those alleging that a crossing was extra hazardous; that the warning devices at the crossing were inadequate; that the train was operating at an excessive speed; and that the physical design of the crossing was faulty. *Walker,* 835 S.W.2d at 471.

Defendant railroad presented evidence in this case that the state had exercised regulatory jurisdiction over the crossing in question in 1982 when it ordered that larger flasher lenses be installed at the crossing. The parties agree that it is clear under Missouri law that the railroad has no authority to install any new crossing safety equipment without the permission of the Division of Transportation. It was also uncontroverted at trial that in 1982, federal funds were used to improve the lenses on the flasher lights. The expenditure of federal funds in the installation of warning devices has been regarded as key in determining whether federal law has preempted the common law with regard to a particular crossing. *CSX Transportation,* 507 U.S. at 670–74, 113 S.Ct. at 1741–42;

*Elrod v. Burlington N. R.R.,* 68 F. 3d 241 (8th Cir.1995).

In their petition, the plaintiffs alleged that defendant "had a duty to plaintiffs to warn of the approach of the train toward the grade crossing with U.S. Highway 24, to reduce its speed, to maintain a lookout, to keep its right-of-way free of obstructions, and to take other actions which would have prevented the collision." Plaintiffs further specifically contended that defendant was negligent in various particulars, some of which were related to the lack of equipment, or condition of equipment at the crossing, and some of which were related to the alleged failure of the operators of the train to slow down, and to sound warnings as it approached the crossing. Defendants moved before trial for rulings which would have removed from the case the issue of the electronic gates at the intersection. Defendant contended that it had no legal authority or responsibility for making decisions about electronic gates, because such decisions are vested exclusively in the state Division of Transportation pursuant to federal and state law. The trial court denied such motions in pre-trial rulings. During trial, the court admitted evidence related to the absence of electronic gates at the intersection.

At the conclusion of the evidence, over plaintiffs' objection, the trial court reconsidered the preemption issue and resolved the issue in favor of defendant. The court submitted a withdrawal instruction to the jury, removing the issue of automatic gates from its consideration. Instruction No. 12 reads: "The issue of the lack of gates at the crossing is withdrawn from the case and you are not to consider such issue in arriving at your verdict."[3] This instruction was modeled after MAI 34.02. Plaintiffs submitted their other claims of negligence to the jury. Plaintiffs' counsel did not mention the lack of

**2.** The Federal Railroad Safety Act has been repealed. Pub.L. 103–272, § 7(b), July 5, 1994, 108 Stat. 1379. The repeal has no effect on proceedings commenced before the date of the repeal. *Id.* See Pub.L. 103–272, § 20106, July 5, 1994, 108 Stat. 866 for the currently applicable provisions.

**3.** The defendants, although contending that a withdrawal instruction was inadequate relief,

tendered its own more thorough withdrawal instruction, which the court rejected. Defendant also contends that the ruling rejecting its tendered instruction was also error. However, defendant has no authority for this contention. Even if defendant's instruction was better than the instruction given, we find no error warranting relief in the refusal to give defendant's proposed instruction.

gates during closing argument, arguing only other grounds of liability. Defendant, of course, was entitled to discuss the withdrawal instruction and to remind the jury in its argument that the jury was not permitted to consider the railroad as having had any duty to install gates. Defendant now argues that the jury was unable to abandon the notion that the railroad should have installed gates at the crossing, and that the verdict is tainted by the fact that the accusations were made, and the evidence was heard, even though the jury was instructed not to consider the matter of the gates. The railroad claims that, even though the trial court decided, late in the trial, that it agreed with the railroad, and gave the jury an instruction withdrawing from the case any issue related to the gates, the railroad was still greatly prejudiced. The railroad argues that the evidence received was prejudicial, and also the verdict directing instruction implicitly re-included the claim of inadequate crossing protection in the charge to the jury. The result, defendant claims, was the denial of a fair trial. The railroad's argument, while cogent, faces several practical obstacles, which we discuss in order below.

### Plaintiffs' Claims Were Submissible

■ The trial court, of course, could not grant a directed verdict to defendant on all issues even after it concluded that the gate issue was preempted. The case involved multiple allegations of negligence, including a generalized failure to warn allegation. Thus, even if the defense of preemption applied to the issue of the electronic gates, the other claims were submissible because there were claims of inadequate warning in other respects, failure to maintain a lookout, failure to decelerate, and failure to properly maintain the flashing lights at the crossing. Plaintiffs presented extensive evidence that the crossing was extremely dangerous, especially in the darkness, because the warning lights were faulty and because an approaching train was difficult to see at that location due to the "visual pollution" in the area. Plaintiffs also presented evidence that the railroad knew that the flashing warning lights had failed to work on several occasions in the past. Inoperative warning lights are, of course, more dangerous than no warning lights, because the non-operation of signals which customarily operate has been regarded as amounting to "an assurance by the railroad that no train is in fact approaching." 74 C.J.S. *Railroads* § 734 (1951). Plaintiffs' argument was that, given the dangerousness of the crossing, and given the railroad's knowledge that the signals did not consistently operate, the railroad had a duty to approach the crossing with great caution, to reduce speed, to keep a careful lookout, to sound a warning, to ensure that the flashing lights are working, and to warn in any other reasonable fashion. There was evidence to support plaintiffs' submission of these other claims.

### The Court Withdrew the Gates Issue

■ The court did withdraw the issue of the failure to provide electronic gates from the jury's consideration. If a court has allowed the admission of evidence which the court subsequently decides was not proper, it may use a withdrawal instruction to withdraw the improper matters from the jury. There is a presumption that the jury follows its instruction. *Barlow v. Thornhill*, 537 S.W.2d 412, 422 (Mo. banc 1976); *Shop 'N Save Warehouse Foods, Inc. v. Soffer*, 918 S.W.2d 851, 861 (Mo.App.1996). "We are to presume that the jury followed the trial court's instruction to exclude the improperly admitted evidence from its consideration and weighed only the properly admitted evidence in coming to its result." *Shop 'N Save*, 918 S.W.2d at 861. We recognize that, in extreme cases, a withdrawal instruction may not be adequate to overcome the effect of prejudicial material introduced in a case. However, the circumstances in such an instance must be exceptional. For instance, in *Wehrkamp v. Watkins Motor Lines, Inc.*, 436 S.W.2d 698 (Mo.1969), an automobile collision case, the trial court erroneously admitted evidence that, prior to the collision, the deceased driver was involved in racing another vehicle. The court believed the improper evidence was so inflammatory and prejudicial that the ruling striking the testimony could not cure the error. *Id.* at 711. Also, in *Spears v. Schantz*, 241 Mo.App. 879, 246

S.W.2d 399 (1952), the court held that evidence that the defendant offered to pay plaintiff's medical expenses was so prejudicial that a withdrawal instruction was inadequate. For an appeals court to make a determination that a withdrawal instruction was inadequate, the court must make a very subjective evaluation. The appellant must make a strong case, or the facts must be such as to cry out for relief. Here, we find it difficult to determine whether the issue of the gates was really much of a factor in anything. We note, for instance, that defendant's counsel chose not to emphasize the withdrawal of the gate issue in closing argument, preferring to spend time on other issues. This is some indication that defendant regarded the discussion of other matters as more significant. Also, we note that the jury did hear evidence from the railroad that the railroad had no authority to install gates without the permission of the Division of Transportation. The jury also heard evidence that prior to 1990, there had been only one collision at the crossing, and that Lohmann's collision was the third collision of 1990. The jury heard that the Division ordered that gates should be installed in 1992. There was no testimony that the railroad had authority to cause electronic gates to be installed.[4] It may not have been extremely difficult for the jury to completely disregard any issue concerning crossing gates. The railroad has not shown exceptional circumstances which overcome the presumption that the jurors abided by the court's instruction. We cannot say that the trial court abused its discretion in failing to grant a mistrial instead of providing a withdrawal instruction.

### The Objections to the Instructions Were Not Preserved

The railroad contends on appeal that instructional mistakes combined with the inadmissible evidence to make it impossible for the jury to disregard the issue of the gates. Although properly objecting to the verdict directing instructions at trial, the railroad failed to preserve the issues for appeal by failing to include the issues in its motion for a new trial. Defendant contends on appeal that the trial court erred in tendering Instruction No. 6, which did not specify the type of warning that defendant failed to provide and the reasons the crossing was "unusually hazardous" so that the jury was allowed to improperly speculate on these issues. Defendant argues that the trial court erred in submitting Instruction No. 5 because it improperly assumed the disputed fact issue of whether the crossing lights were operating. Defendant further contends the instruction was erroneous in that there was no evidence that defendant's train could have avoided the accident by activating the emergency brakes once the train crew became aware of the hazard posed by plaintiff's truck.

Plaintiffs claim these alleged errors were not preserved for appellate review because defendant failed to raise claims of error to this instruction in its motion for new trial. Defendant specifically objected to these instructions during the instruction conference at trial. However, defendant's very extensive motion for new trial failed to preserve these claims of error. Defendant counters that these errors were preserved for appellate review pursuant to Rule 78.07, which provides in part: "Where definite objections or requests were made during the trial in accordance with Rule 78.09, including specific objections to instructions, a general statement in the motion [for new trial] of any allegations of error based thereon is sufficient." Defendant's general allegation of error in its motion for new trial stated:

> In addition to the errors discussed above, defendant also requests the Court enter an order granting defendant's Motion for New Trial/Judgment Notwithstanding the Verdict, based on any other rulings of the Court to which defendant objected or requests of defendant which were not granted by the Court as may be revealed by the

---

**4.** Plaintiffs contended at trial that the railroad, upon having notice of the dangerousness of the intersection, had a duty to recommend to the Division of Transportation that electronic gates be ordered for the crossing. The trial court ruled this issue against the plaintiffs. That issue is not before us on this appeal and is not addressed.

record, when available, pursuant to Supreme Court Rule 78.07 and 78.09.

This general allegation in defendant's motion for new trial was so vague as to be meaningless. It requires the trial judge to remember and think through every objection made at trial. No trial judge is capable of meeting this standard in a complex and lengthy case. This "general allegation" was not sufficient to preserve defendant's objection as to Instructions No. 5 and 6 for appellate review. *See Bowman v. Burlington Northern, Inc.*, 645 S.W.2d 9, 11 (Mo.App.1982); *Skelton v. General Candy Co.*, 539 S.W.2d 605, 610 (Mo. App.1976) (where the court held an instructional error was not preserved for appellate review where the motion failed to refer to the objection that the instruction "contained dual theories"). Although Rule 78.07 does not require an allegation in a motion for new trial be detailed if a specific objection is made at trial, the allegation contained in the motion for new trial must direct the court's attention generally to the specific allegation of error defendant is raising. The purpose of Rule 78.07 is not to provide counsel with standard boilerplate language which automatically preserves everything for appeal. It is simply a rule designed to allow counsel to avoid lengthy and complex explanations as to their contentions of error in the motion for new trial. It was not intended to change the requirement that the motion for new trial inform the court of the contentions of error which the litigant believes warrant relief.

### The Withdrawal Instruction Was Considered Along With the Verdict Director

Although the verdict directing instruction submitted a general "failure to warn" allegation, without specifying what kind of warning, the withdrawal instruction should have been understood as withdrawing the issue of the gates from the jury's consideration. For the reasons already stated, we presume that the jury was able to follow the withdrawal instruction and to segregate out the issue of crossing gates from other possible ways of warning the plaintiff.

### There Was Evidence That The Crossing Was Unusually Hazardous

Moreover, the plaintiffs pleaded that the crossing was unusually hazardous, and presented evidence from which a jury could make such a finding. Generally, a crossing is extrahazardous when the circumstances are such that a railroad can reasonably anticipate that a person exercising ordinary care would nevertheless be subjected to the likelihood of injury. *Carson v. Thompson*, 161 S.W.2d 995 (Mo.App.1942). There is authority for the proposition that the jury is not, in such a case, to determine what particular means the railroad should have employed to protect persons using the crossing, but to determine whether, under the circumstances, the means used were sufficient to constitute due care. *See* 65 Am.Jur.2d *Railroads* § 508 (1972). Consequently, in submitting their case, the plaintiffs arguably were not required to specify exactly the nature of the warning which they contend should have been given. Instead, plaintiffs could simply ask the jury to decide whether the means used were reasonable under the circumstances. If that is so, the vagueness of the jury instruction would have been a difficulty inevitably faced by the railroad in the case. A limiting instruction which clearly removes the issue of the gates from the case might have been the only practical way of addressing the defendant's concerns about the jury's "roving commission." However, we need not specifically resolve the issue with regard to the instruction in view of the fact that defendant's contentions about the instructions were not included in the motion for new trial.

### Other Accidents

In Point VI, defendant asserts that the trial court erred in admitting evidence of other collisions involving trains because the other collisions were not similar and did not arise out of the same cause as the December 22, 1990 accident at issue in this case. The trial court allowed testimony about three other collisions which occurred at the Monroe City crossing before the December 22, 1990 accident. Archie Burnham, Jr., a consulting engineer specializing in traffic engineering

and safety, testified that the first collision at the crossing happened in December of 1975. The automobile involved in the collision was traveling south on Highway 24 and the train was traveling east. The collision occurred at 7:35 in the morning, in daylight. A second witness, Eddie Dray, testified about the second collision, which occurred in darkness on May 5, 1990, and involved his daughter, who was killed in the incident. Ms. Dray was traveling north on Highway 24 and the train was traveling west, at the time of the collision. After the incident, Mr. Dray spoke with a representative of the railroad several times in the months following his daughter's death, insisting that the visibility at the crossing was poor because the lights in the parking lot and around the Pace Industries building, as well as the lights down Main Street, made it difficult to see an approaching train at night. William Keller, who was involved in the third accident, in testified that the train struck his vehicle at about 1:00 a.m. on October 27, 1990. Mr. Keller said that, as he approached the tracks, the light came on approximately 50 feet before he reached the tracks. He said that he slowed, glanced both ways, then proceeded across the tracks and was struck by the train. He told train representatives after the accident that in his opinion the crossing was very dangerous and that he thought that the train was difficult to see because the headlight of the train tended to blend in with the lights on and around the factory at Pace Industries.

■■■■■ Trial courts have substantial discretion in ruling on the admissibility of evidence of similar occurrences. *Richardson v. State Highway & Transp. Comm'n,* 863 S.W.2d 876, 881 (Mo. banc 1993). Our review is limited to "whether the trial court determined that the evidence was relevant and that the occurrences bore sufficient resemblance to the injury-causing incident, while weighing the possibility of undue prejudice and confusion of issues." *Id.* The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration. *Anglim v. Missouri Pac. R.R.,* 832 S.W.2d 298, 303

(Mo. banc), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992).

■■■■■ The trial court generally will admit evidence of prior accidents if the accident sought to be admitted: (1) is an accident of like character; (2) occurred under substantially the same circumstances; and (3) the accident resulted from the same cause. *Hess v. Chicago, Rock Island & Pac. R.R.,* 479 S.W.2d 425, 431 (Mo.1972).

Where the theory of recovery is negligence, any knowledge or warning that defendant had of the type of accident in which plaintiff was injured clearly aids the jury in determining whether a reasonably careful defendant would have taken further precautions under all the facts and circumstances, which include the knowledge of defendant of prior accidents.

*Stacy v. Truman Medical Center,* 836 S.W.2d 911, 926 (Mo. banc 1992). When evidence of prior accidents is presented to show notice of danger, the similarity of the circumstances surrounding the accidents does not have to be completely symmetrical. *Pierce v. Platte–Clay Elec. Coop., Inc.,* 769 S.W.2d 769, 774 (Mo. banc 1989). In discussing the similarity requirement, one court, quoting McCormick, stated:

The proponent probably will want to show directly that the defendant had knowledge of the prior accidents, but the nature, frequency or notoriety of the incidents may well reveal that defendant knew of them or should have discovered the danger by due inspection. Since all that is required is that the previous injury or injuries be such as to call defendant's attention to the dangerous situation that resulted in the litigated accident, the similarity in the circumstances of the accidents can be considerably less than that which is demanded when the same evidence is used for one of the other valid purposes.

*Stacy,* 836 S.W.2d at 926 (*quoting* McCormick on Evidence, § 200, at 848 (4th ed. 1992) (footnotes omitted)).

■■■■ Defendant claims that the evidence of prior accidents was not sufficiently similar to the instant accident and that the accidents were too remote in time to be admissible.

We disagree. The trial court could reasonably infer that the prior accidents described incidents which were sufficiently similar to the Lohmann accident to have probative value on the issue of the dangerousness of the crossing, and on the issue of notice of the high degree of danger associated with the crossing. The evidence showed that, following the other incidents, complaints were made to railroad representatives about the difficulty of seeing a train at the crossing due to the lights surrounding the Pace Industries building and other lights from the city. This evidence had a logical tendency to show that defendant had notice of the extra-dangerous nature of the crossing, and of the need to take extra caution as the train approached the intersection. The court did not abuse its discretion in admitting this evidence.

### Prior Signal Malfunctions

Defendant also objected to evidence of prior signal malfunctions which had occurred at the crossing. Defendant claims that the testimony should not have been admitted into evidence because it was based on unverifiable hearsay testimony presented by witnesses lacking personal knowledge of the occurrences, and that the occurrences were not similar to the December 22, 1990 accident. Lewis Frosch, defendant's track inspector and foreman from 1975 to 1989, testified that he received several reports about signal malfunctions at the crossing in 1989 and 1990. Also, witness George Yates testified that six months before Lohmann's accident he came close to experiencing a collision with the train when the warning flashers failed to activate. Witness Joe McCallister testified that he witnessed two incidents in 1990 where the warning flashers activated later than they should have. In one instance, he observed that the train was actually at or past the crossing before the warning lights activated.

The standard applicable to the trial court's ruling is whether the trial court abused its discretion in admitting the evidence. *Copeland v. Mr. B's Pool Centers, Inc.*, 850 S.W.2d 380, 381 (Mo.App.1993).

An "abuse of discretion" standard, by definition, means that, in many instances, the ruling of the trial court would be upheld regardless of whether the evidence had been admitted or excluded. The appellate court simply defers to the trial court in view of its superior opportunity to evaluate the proffered evidence in the context of the trial.

*Id.* In other cases, Missouri courts have allowed testimony regarding prior signal malfunctions at railroad crossings. *See Grace v. Smith*, 365 Mo. 147, 277 S.W.2d 503, 509 (banc 1955); *Silvey v. Missouri Pac. R.R.*, 445 S.W.2d 354, 357 (Mo.1969); *Hale v. Kansas City Southern Ry.*, 363 S.W.2d 542, 544 (Mo.1963); *Willsie v. Thompson*, 359 Mo. 775, 223 S.W.2d 458, 460 (banc 1949). All of this testimony was admissible. The testimony of Mr. Frosch, even if not admissible to prove that the warning lights had malfunctioned, was admissible to show that the railroad had notice of the occasional malfunction of the signals. The testimony of the other witnesses, which tended to show that the lights had indeed malfunctioned, was admissible to show the unusually hazardous nature of the crossing. Such evidence was therefore relevant to the issue of the extent of the railroad's duty to warn Mr. Lohmann as his truck approached the crossing. We hold that the court did not abuse its discretion in admitting evidence of the prior signal malfunctions. Point VI is denied.

### Safety and Accident Record

In Point VII, defendant claims that the trial court erred in allowing plaintiffs to present testimony about defendant's overall safety and accident record as compared to others in the industry because the evidence was irrelevant and prejudicial. Plaintiffs' counsel questioned Danny Gilbert, defendant's manager of grade crossing safety, about whether it was true that defendant had the highest accident rate among railroads. Defendant objected to the question, contending it had no relevancy to the Lohmann accident. The trial court sustained the objection. Defendant moved for a mistrial, which was denied by the trial court. Defendant does not now claim that the trial court erred in failing to grant a mistrial. Thus, defendant has no

currently pending contention of trial court error in this regard.

■■■ Defendant also complains about certain testimony given by David Goode, defendant's chairman. Over defendant's objection, plaintiffs were allowed to introduce a portion of Goode's videotaped deposition testimony. The focus of Goode's testimony was defendant's general approach to grade crossing safety and deficiencies in defendant's nation-wide safety record. The evidence was offered to show defendant's lack of an effective safety program. Missouri courts have allowed the introduction of evidence that, at the time of an accident, the defendant did not have an adequate or appropriate safety program in place. *See Tune v. Synergy Gas Corp.*, 883 S.W.2d 10, 15 (Mo. banc 1994). Such evidence has a logical tendency to be probative of negligence. One may reasonably infer that an effective and meaningful safety program would have had a tendency to promote behaviors and actions which would have prevented this injury. In this case, plaintiffs were contending that the electrical relays and circuitry were defective at the time of the collision. For instance, one could infer that an effective safety program could and would have been designed to discover and replace old and unreliable equipment. We do not find that the trial court abused its discretion in allowing this testimony. Point VII is denied.

### Closing Argument

In Point VIII, defendant argues that the trial court erred in overruling defendant's objections to plaintiffs' closing argument regarding the state's post-accident conclusions on crossing safety. The trial court further erred, according to defendant, in overruling defendant's objections to plaintiffs' unduly inflammatory arguments.

■■■ Plaintiffs respond that defendant failed to preserve these alleged errors for appellate review because defendant failed to raise the allegations in its motion for new trial. At trial, defendant made specific objections to the above noted portions of the closing argument. However, defendant did not address these alleged errors in its motion for new trial. Defendant did include an en-

tirely different allegation of error relating to another portion of closing argument. Defendant did not mention the contentions now presented. Defendant's general allegation of error, as discussed above, was so vague that it preserved absolutely nothing for review. Point VIII is denied.

### Tachograph Reports

In Point IX, defendant claims that the trial court erred in excluding Lohmann's prior tachograph reports, which were recorded on Lohmann's previous trips between Columbia and Monroe City. Defendant further claims that the court erred in refusing to allow evidence of Mr. Lohmann's prior accidents because the court allowed Lohmann to introduce testimony and argue that he was safety-conscious and a professional driver who would have stopped if the lights had been flashing.

During trial, defendant attempted to introduce evidence of three prior tachograph reports recorded by Lohmann on previous trips between Columbia and Monroe City recorded on October 22, 1990, October 23, 1990, and December 17, 1990. A tachograph is a recording or registering device that in this case measured the speed Mr. Lohmann's truck traveled on his prior trips. The prior tachographs showed that Lohmann had a mean average speed of about 58 miles per hour on these trips. The trial court refused to admit the tachographs. Defendant argues that it sought to introduce this evidence to rebut Lohmann's evidence that he was a good driver and was safety-conscious.

Bob Werneth testified on behalf of Lohmann at trial, stating:

Werneth: I felt better with him in front, he's pretty keen, pretty young, good eyes and stuff. He was an exceptional kid. He was just keen about stuff. He once flew an airplane, you know.

Respondent: What?

Werneth: He was a pilot, had a pilots license, and, I don't know, he would see deer where I wouldn't see them on the road. He was very safety-conscious.

He always wore a seat belt, never smoked cigarettes. Different kind of kid, keen, sharp. I would have rather had him in front than me. My vision isn't that great.

 Defendant, citing *Williams v. Bailey,* 759 S.W.2d 394, 396 (Mo.App.1988), claims that generally the fact that someone is a good driver is not admissible because it does not tend to establish that he was not negligent at the time of an accident. We agree with that proposition. Here, however, defendant did not object to the testimony that it sought to rebut. Therefore, defendant's only avenue of response was under the doctrine of curative admissibility, which allows rebuttal of unobjected inadmissible evidence by evidence of the same type or character. *See Koontz v. Ferber,* 870 S.W.2d 885, 894 (Mo.App.1993). However, defendant failed to articulate to the trial court precisely how the tachographs rebutted the testimony that Lohmann was "keen," "sharp," and observant, or the testimony that he was "safety conscious." The tachographs do not in themselves directly show that Lohmann was not "safety conscious." It is true that evidence that Lohmann exceeded the speed limit on three trips may be evidence of negligence. However, evidence that plaintiff Lohmann did not always drive within the 55 mph highway speed limit did not directly rebut Werneth's testimony. Werneth never testified that Lohmann always stayed within the speed limit. The tachograph reports offered into evidence by defendant did not pertain to the trip on the day in question, nor was plaintiff's speed at the time of the collision a disputed issue in this case. Also, defendant has not shown that the tachograph evidence of the three specific trips was evidence of the "same type or character" as Werneth's remarks. We conclude that the trial court did not abuse its discretion in excluding the tachographs from evidence.

*Prior Accidents*

 Defendant also argues that the trial court abused its discretion in excluding evidence that Lohmann had been involved in twelve vehicular collisions prior to this inci-

dent. Generally, evidence of similar prior acts of *negligence* are not admissible to show that a party acted negligently at the time of a subsequent injury. *McComb v. Vaughn,* 358 Mo. 951, 218 S.W.2d 548, 552 (1949). Of course, here the evidence was not offered to show that plaintiff Lohmann was negligent at the time of the collision, but instead was offered in rebuttal to plaintiffs' evidence that Mr. Lohmann was "safety conscious." However, the fact that a collision occurred, or that twelve collisions occurred, does not prove in itself that any particular party was at fault. There was no evidence as to how many, if any, of the incidents involved fault on the part of Mr. Lohmann. Thus, it is not entirely clear how this evidence directly rebuts the statement that Mr. Lohmann was "safety conscious" and "keen." It is possible that many of the incidents involved fault on the part of other parties. There was no attempt by defendant to limit the offer to incidents involving fault on the part of Lohmann. It is incumbent on the party offering the evidence to establish the admissibility of the evidence. The opportunity to introduce rebuttal evidence under the doctrine of curative admissibility may have been available to defendant, but it is necessary for defendant to articulate to the trial court just how the evidence is proper rebuttal to the notion that plaintiff was "safety conscious" and "keen." As already noted, the evidence must be of the same type or character, and must logically rebut the inadmissible testimony which was received. Also, even if the evidence is logically relevant, and otherwise eligible under the doctrine of curative admissibility, the court may exercise its discretion to exclude evidence which the court believes may tend to confuse or sidetrack the jury, or which it believes may have a prejudicial effect which outweighs the probative value. *Kelly v. Jackson,* 798 S.W.2d 699, 704 (Mo. banc 1990). The focus is not on whether the evidence was admissible, but on whether the trial court abused its discretion in excluding the evidence. *Copeland,* 850 S.W.2d at 381. The trial judge could reasonably have been suspicious that evidence of the mere fact that plaintiff Lohmann had been involved in twelve collisions, standing alone, would have a tendency to mislead or confuse the jury, in

the absence of detail as to actual fault in the collisions. We hold there was no abuse of discretion in excluding the evidence. Point IX is denied.

### Denial of Continuance

In Point X, defendant contends that the trial court erred in denying defendant's request for a continuance because it did not afford defendant the requisite reasonable opportunity to defend against new theories of liability contained in plaintiffs' amended complaint by conducting additional discovery and filing a motion for summary judgment. The original petition in this case was filed on October 15, 1993. On August 4, 1995, approximately three weeks before trial, plaintiffs requested leave to amend the petition to add three new claims against defendant: 1) failure to provide adequate crossing protection; 2) failure to train railroad personnel adequately in designing, constructing, and maintaining grade crossings; and 3) negligence per se in failing to comply with federal regulations at a crossing where federal funds had participated in an upgrade of crossing protection. Defendant objected to plaintiffs' request to amend the petition. On August 14, 1995, the trial court granted leave to amend the petition. On August 23, 1995, defendant filed a motion for a continuance, which was subsequently denied by the trial court.

Defendant complains that it did not have a reasonable opportunity to conduct discovery on the claim for inadequate crossing protection. Defendant contends that it was therefore unable to establish conclusively before trial that such claim was preempted by state and federal law. Also, defendant claims it needed a chance to develop its state law preemption defense by conducting additional discovery to support its contention that the Missouri Division of Transportation had exclusive jurisdiction over the controls at the crossing. Defendant argues that it lacked the time to develop its defense and to brief the issues related to this claim so that the trial court could rule on preemption prior to trial. Instead, extensive testimony and exhibits on preemption issues were presented to the jury that, defendant contends, could not be cured by a withdrawal instruction.

Plaintiffs claim that the amendment of their petition did not create any surprise or hardship which would have prejudiced defendant, because in the initial petition plaintiffs included a claim that the railroad failed to properly maintain its grade crossing. Citing the Manual on Uniform Traffic Control Devices, plaintiffs claim that the word "maintain" necessarily includes "not just repair, but the continuous upgrade of safety features as conditions warrant." Thus, plaintiffs claim that there was no injection of any new issue into the case, but rather a clarification of an already existing claim. We note also that, when plaintiffs speak in their petition of failure to warn, one of the things which readily comes to mind is the absence of gates, which are a pre-eminent warning device. We agree that defendant had plenty of notice it would be dealing with the preemption issue in this matter long before the amendment. We fail to see exactly how additional discovery would have assisted the defendant in arguing that the railroad had no authority to install electronic gates, and defendant fails to explain. Our review of the pleadings in the light of the overall circumstances leads us to conclude that defendant could reasonably have anticipated the need to be prepared to deal early with the issue of whether the railroad had, by law, any authority and responsibility to install crossing gates.

Generally, a ruling on whether to grant a continuance rests largely in the trial court's discretion. *Seabaugh v. Milde Farms, Inc.*, 816 S.W.2d 202, 207 (Mo. banc 1991). It is the trial court's responsibility to control its docket and the progress of litigation. *Collins v. Director of Revenue*, 691 S.W.2d 246, 254 (Mo. banc 1985). The denial of a continuance rarely constitutes reversible error, although the trial court does not have absolute or arbitrary discretion. *Seabaugh*, 816 S.W.2d at 207. We recognize that trial preparation is extremely demanding, and that late adjustments can have a brutal impact on trial preparation. While a trial court should never be insensitive to the plight of attorneys, the trial court also must run a docket and make difficult decisions. Some

cases might take years longer than necessary to get to trial if the court always deferred to the attorneys.

Defendant claims that this case is similar to *Missouri Pub. Serv. Co. v. Argenbright,* 457 S.W.2d 777, 785 (Mo.1970), in which a utility seeking an easement requested a continuance after the trial court unexpectedly permitted a significant amendment at trial. The trial court denied the continuance. The Supreme Court reversed, finding that the denial of the continuance was prejudicially erroneous to the utility because the utility had a valid claim of surprise and the amendment was substantial. *Id.* Defendant also cites *Simon v. S.S. Kresge Co.,* 103 S.W.2d 523 (Mo.App.1937), where the appellate court reversed the trial court for denying a continuance in a slip-and-fall case. During the course of trial, the trial court allowed the plaintiff to amend the petition to add a claim alleging that her fall had aggravated a pre-existing condition. The final case defendant cites is *Wintz v. Hyatt Hotels Corp.,* 687 S.W.2d 587, 589 (Mo.App.1985), where defendants requested a continuance after plaintiffs introduced an x-ray at trial that had not been previously furnished to defendants. The reviewing court found the denial of the continuance prejudicially erroneous. *Id.* at 591. These cases all involved a surprise action by an opponent which occurred during trial, rather than several weeks before trial. In this case, we fail to see that surprise was a significant factor. It would have been clear early on that the authority and duty of the railroad to upgrade equipment would be a legal battle which would significantly affect the processing, and perhaps the result, of the case. In addition, we are not persuaded that any actual amendment in this case was a substantial and fundamental departure from the issues previously framed. We find no abuse of discretion in the denial of a continuance. Point X is denied.

### Conclusion

The judgment is affirmed.

All concur.